UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| INCAT CROWTHER AMERICA, L.L.C. | * | CIVIL ACTION NO. 24-1061 |
| | * | |
| | * | SECTION: "T"(1) |
| VERSUS | * | |
| | * | JUDGE GREG G. GUIDRY |
| BIRDON AMERICA, INC. | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| | * | |
| ************************************ | * | |

ORDER AND REASONS

This is a trade secret misappropriation case concerning certain vessel designs. Before the Court is defendant Birdon America, Inc.'s Motion to Compel Incat Crowther America L.L.C. to supplement its responses to Interrogatories 8 and 9, which seek a description of (1) the portions of Incat's trade secret documents that were contributed by others and (2) Incat's alleged "skill, proprietary method, or approach" and any distinction between that and the common knowledge in the shipbuilding field as it relates to the alleged trade secrets. (Rec. Doc. 82). Finding Incat's responses to these interrogatories sufficient, the Motion to Compel is DENIED.

Background

In 2021, Incat and Birdon began discussing a joint endeavor to pursue a U.S. Coast Guard contract for the Waterways Commerce Cutters project ("WCC Project"), which was expected to result in the purchase of up to 30 new vessels. Birdon would serve as the general contractor, and Incat would contribute its design services. Pursuant to the Teaming Agreement between the parties, any intellectual property rights developed solely by one party would belong exclusively to that party. Incat contends it solely developed intellectual property for the WCC project including "vessel designs, principal hull dimensions and shape definition, vessel subdivision, deck and space arrangements, exterior styling, 3D renderings, technical bid specifications, engineering solutions,

1

verified design processes using proprietary ABS spreadsheets, structural calculations, global analysis, hull resistance calculations, hull form and appendage design reports, structural design reports, propulsion system reports and other proprietary information and documents." (Rec. Doc. 34, at 5).

In October 2022, the Coast Guard awarded the project to Birdon, who was tasked with delivering up to 16 river buoy tenders and 11 inland construction tenders. The parties began negotiating an agreement to formalize Incat's subcontract role, consistent with the Teaming Agreement. Based on the parties' longstanding relationship, Incat began performing subcontract services immediately. Birdon then proposed acquiring a majority stake in Incat to obtain unlimited use of Incat's intellectual property. When this latter proposal fell through, Incat contends that Birdon ceased good-faith negotiations regarding the subcontract for the WCC project.

Incat alleges that by December 2023, it had, at Birdon's request, completed approximately 8,000 additional engineering man-hours of subcontract services for the WCC project, including developing more detailed and refined vessel plans, structural calculations, and system integrations. Yet, Incat claims, Birdon has failed to pay Incat the amounts owed.

Incat alleges that it offered to license its intellectual property to Birdon for a commercially reasonable fee so that Birdon could complete the WCC project. Birdon ignored this offer.

Incat contends that without a subcontract or a license, Birdon has no authority to use any of Incat's intellectual property. Yet as recently as March 25, 2024, the Coast Guard continues to represent that Incat's designs are being used on the WCC project. In briefing on the present motion, Birdon asserts that, in fact, it began construction of the first vessel in May 2025 and anticipates delivery in August 2026. At oral argument on the present motion, it explained that the designs submitted with the proposal have undergone modifications.

According to Birdon, the parties' negotiations broke down because Incat refused to agree to certain terms that were specified in the Teaming Agreement and were required by the Coast Guard. Birdon also contends that Incat's work required significant corrections and input by Birdon's design engineers. Birdon reported at oral argument that it has paid Incat about $1.5 million of the $2.5 million of the fee contemplated, even though it estimates Incat only completed 30% of the design work.

Incat filed suit against Birdon on August 26, 2024, asserting causes of action for trade secret misappropriation, unfair trade practices, breach of contract, conversion, open account, and detrimental reliance.

In November 2024, the undersigned granted Birdon's first Motion to Compel and ordered Incat to supplement its Trade Secrets Identification Statement to identify "the contents or portions of the documents it has cited with language sufficient to allow Birdon and the Court to compare the trade secret to information that is generally known or readily ascertainable and to understand what information is claimed to be the trade secret." Rec. Doc. 55, at 1. Incat's original Trade Secrets Identification Statement had merely listed documents. The Court required that:

> If Incat contends that the entirety of each document (i.e. the compilation of information contained therein) is a trade secret but not more than that, it must say so explicitly in the verified statement. If each document also contains separate trade secrets (e.g., certain design elements, combinations of elements, or methods of calculation) that Incat contends are themselves also protected, Incat must separately identify them with particularity.

Id. at 6-7. However, the Court rejected Birdon's proposal "that Incat go through its cited documents and 'separate out Incat's contributions from the contributions of the USCG,'" finding that such identifications would only be appropriate if "Incat contends that specific portions of the cited documents (e.g., certain design elements) constitute trade secrets on their own." Id. at 7.

3

Thereafter, Incat revised its Trade Secret Identification Statement as a Verified Supplemental Trade Secrets Disclosure ("Supplemental Disclosure"). It identified the entirety of each cited document (the "Design Deliverables") as the trade secrets, explaining that its "trade secrets are the functional design deliverables . . . created through its proprietary process." Rec. Doc. 66, at 1.  The Design Deliverables include (based on their Titles) certain reports, drawings, analyses, models, graphs, plans, and calculations. Incat's Statement further explains that:

> Incat utilized its proprietary process to develop the functional design deliverables. Incat's design process optimizes technical requirements to arrive at a design solution by deploying unique engineering tools, checklists, databases populated with prior data, and validation procedures, all of which were created by Incat and were not shared with Birdon or the USCG.
> The deliverables listed in Exhibit A are the direct and unique outputs of Incat's proprietary process, including vessel designs, principal hull dimensions and shape definition, vessel subdivision, deck and space arrangements, exterior styling, 3D renderings, technical bid specification compliance, engineering solutions, verified design processes using proprietary ABS spreadsheets, structural calculations, global analysis, hull resistance calculations, hull form and appendage design reports, structural design reports, and propulsion system reports. While some USCG specifications are necessarily included within these documents, the entirety of each deliverable constitutes Incat's original work product. That is because Incat analyzed, arranged, and integrated the USCG specifications into its proprietary design process to generate a comprehensive, constructible vessel design. This integration transforms the raw specifications into an optimized, functional design that did not exist before Incat's work and were generated based on Incat's unique skillset and utilization of its own proprietary methodology.

Id. at 1-2. Thus, Incat does not contend that specific portions of the Design Deliverables constitute trade secrets on their own, but that the "compilation of material" is the trade secret. See id. at 1.

Shortly thereafter, the District Court stayed discovery pending a ruling on Birdon's Motion to Dismiss. On March 19, 2025, the District Court granted the motion in part and denied it in part. Rec. Doc. 76. Incat's claim for conversion was dismissed, but its other claims remain. Id.  That same day, the District Court issued a scheduling order setting trial for December 8, 2025, and requiring the parties to complete discovery by September 29, 2025. On July 28, 2025, Incat moved

to continue the trial because of the volume of documents produced so far (700,000 pages of technical documents) and because it claims that Birdon has not yet produced other categories of documents (and is still making voluminous productions as of the date of the motion to continue). The District Court granted the motion on August 13, 2025. New dates have not yet been set.

Presently before the Court is Birdon's Motion to Compel. Birdon seeks a supplemental response to its Interrogatory 8, asking Incat to describe the documents listed in Incat's Supplemental Disclosure in detail, including "what portions of the documents were contributed by others such as, for example, Birdon or the United States Coast Guard." (Rec. Doc. 82-3, at 9). It also seeks a supplemental response to Interrogatory No. 9, asking Incat to describe in detail the nature of any skill, proprietary method, or approach that resulted in the materials constituting Incat's trade secrets and any distinctions between such skill, proprietary method, or approach and what was known in the trade at that time. (Rec Doc. 82-5, at 8).

Incat opposes. It insists that its present responses are sufficient. It has produced every document that relates to this case and that could reflect any "contributions" from others. It argues that Birdon is in as good of a position or better than Incat to review and determine whether any third party made contributions to Incat's trade secret documents by examining these documents. Incat also argues that it has already provided a narrative response addressing Birdon's Interrogatory No. 9 and that no further information is necessary.

In reply, Birdon counters that Incat is in a better position to identify the contributions of others. It argues that Incat's reliance on Rule 33(d) is insufficient because of the volume of documents it has cited without further explanation. And it argues that under the relevant law, Incat must distinguish its purported trade secrets from common ship-build design principles. It insists

5

that Incat's general reference to its proprietary methods fail to show how the purported "trade secrets" are unique.

## Law and Analysis

1. *Scope of Discovery*

The Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id.

"[I]information is relevant if it 'bears on, or that reasonably could lead to other matters that could bear on, any issue related to the claim or defense of any party.'" Leonard v. Martin, 38 F.4th 481, 489 (5th Cir. 2022) (quoting Coughlin v. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991)). "The threshold for relevance at the discovery stage is lower than the threshold for relevance of admissibility of evidence at the trial stage." Tate v. DG Louisiana LLC, 653 F. Supp. 3d 316, 319–20 (E.D. La. 2023).

Relevant information falls within the scope of discovery only if it is proportional to the needs of the case. Rule 26 requires consideration of the following factors in assessing proportionality: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Proc. 26(b)(1).

Pursuant to Rule 33:

If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the

> answer will be substantially the same for either party, the responding party may answer by:
> (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and
> (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Fed. R. Civ. P. 33(d). Indeed, a party is not usually obligated to engage in extensive review and compilation to make its opponent's case.

> As a general rule a party in answering interrogatories must furnish information that is available to it and that can be given without undue labor and expense. But a party cannot ordinarily be forced to prepare its opponent's case. Consequently interrogatories that require a party to make extensive investigations, research, or compilation or evaluation of data for the opposing party are in many circumstances improper.

Melder v. Allstate Corp., No. CV 03-2499, 2007 WL 9777975, at *4 (E.D. La. Nov. 5, 2007) (quoting 8 Fed. Prac. & Proc. § 2174 (2d ed. 1994)).[1] In Melder, the magistrate judge held that the defendant would not be required to produce information that was "not reasonably accessible using its existing computer programs." Id.

2. *Applicable Law Impacting Relevance Determination*

    a. *Trade Secret Misappropriation*

Incat asserts a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. Rev. Stat. § 51:1431. Both statutes similarly define "trade secret" as any "information" (1) that "derives independent economic value" from "not being generally known to" or "readily ascertainable" by other persons and (2) where reasonable efforts have been taken to maintain the secrecy of the information. 18 U.S.C. § 1838(3); La. Rev. Stat. § 51:1431(4). Both statutes

---

[1] The current version of Federal Practice and Procedure begins "Consequently *it was well recognized before Rule 26(b)(2)(C)'s explicit proportionality limits were adopted* that interrogatories that require . . . ." § 2174 8B Fed. Prac. & Proc. Civ. § 2174 (3d ed.) (emphasis added).

7

specifically identify "compilations" as a type of information that may be protected; the DTSA also identifies "designs" and "prototypes." Id. Indeed, "[i]t is well established that a compilation or aggregation of otherwise publicly available information constitutes a trade secret." Centurum Info. Tech. Inc. v. Geocent, LLC, No. CV 21-0082, 2021 WL 533707, at *13 (E.D. La. Feb. 12, 2021). Take, for example, a recipe where the ingredients are publicly available but "the combination of ingredients, their exact quantities, and the method of preparation comprise a trade secret." Id.; see Source Prod. & Equip. Co. v. Schehr, No. CV 16-17528, 2019 WL 4752058, at *7 (E.D. La. Sept. 30, 2019) ("Although some of the shapes, dimensions, and materials of construction used in the Aspect Containers may be in the public domain, the combination of characteristics together can constitute a trade secret.").

"Plaintiff bears the burden of 'identif[ying] the trade secrets' and 'showing that they exist.'" SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C., No. CV 20-2970, 2021 WL 4460522, at *9 (E.D. La. Sept. 29, 2021) (quoting Source Prod., 2019 WL 4752058, at *5). This means that plaintiffs "must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.'" Id. (quoting InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 658 (9th Cir. 2020)) (alteration in original). And "[p]laintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." InteliClear, 978 F.3d at 658.

Birdon cites RealD Spark, LLC v. Microsoft Corp., where the defendant moved to compel the plaintiff to identify the allegedly misappropriated trade secrets with more particularity. No. 2:22-CV-00942-TL, 2023 WL 3304250, at *3 (W.D. Wash. May 8, 2023). Defendant complained that plaintiff had merely identified "categories" of trade secrets that were insufficient to provide

8

reasonable notice and that plaintiff had not made a distinction between what was publicly known and what was the trade secret. Id. For example, plaintiff had identified as one category of trade secrets "image recognition algorithms for different types of faces, lighting, eye color, and eyeglasses." Id. at *4. The plaintiff had not identified the actual algorithm. Id. The defendant presented the court with two patents applying image classification algorithms to recognize faces and three publicly available articles describing how various features (head pose, lighting conditions, etc.) must be considered when studying gaze redirection. Id. The court required plaintiff to supplement and provide the image recognition algorithms (subject to a protective order). Id. at *5.

Another category of trade secrets in RealD was "datasets" to support the image recognition methods. Id. Plaintiff merely identified 3,000 pages as containing the datasets. Id. at *6. The Court held that this did not satisfy the requirements of Rule 33(d) and required plaintiff to specify the pages that revealed the datasets. Id. Another category was "source code" that contained and implemented the trade secrets. Id. at *7. The court required that plaintiff "precisely identify the source code or portions of its source code that it alleges constitute the trade secret misappropriated by" the defendant. Id.

b. *Contractual Requirements*

The Teaming Agreement here addresses ownership of intellectual property in multiple provisions. In Section 9.1, the parties agreed that "[e]ach party retains its own existing Intellectual Property Rights, including . . . any Intellectual Property Rights that may be created by it in respect of the Proposal or the performance of its obligations under this agreement. Rec. Doc. 35-5, at § 9.1. The parties also agreed that "[a]ny Intellectual Property Rights developed solely by one party, including by its employees or sub-contractors, in the course of work performed for the Proposal

or in performance of this Agreement and prior to the execution of a Sub-contract belongs exclusively to that party." Id. at § 9.2(a)). Incat agreed in Section 9.3 to grant Birdon a royalty-free license to use Incat's intellectual property to prepare the proposal to the Coast Guard. And the parties further agreed that "[s]ubject to this clause 9, as between the parties, all Intellectual Property Rights in the Proposal belong to Birdon." Id. at § 9.4.

Birdon argues that the use of the term "solely" in Section 9.2(a) precludes Incat from asserting intellectual property rights over some or all of the alleged trade secrets here. Incat contends that the other provisions of the Teaming Agreement show that the "solely" language is not determinative. The interpretation of the contract is not now before the Court, but the parties' dispute regarding the contractual language helps frame the relevance of the information requested by Birdon in discovery.

3. *Analysis*

Through Interrogatories No. 8 and No. 9, Birdon seeks information about the public nature of each trade secret document on the one hand and the proprietary nature of each document on the other. There appears to be no dispute between the parties that Birdon is entitled to this information. The issue is whether Incat's responses are sufficient. The Court finds that Incat has provided sufficient information about the basis of its claim that the documents amount to trade secrets and that further response to Interrogatories No. 8 and No. 9 would be disproportionate with the needs of the case.

Interrogatory No. 8 requests the following: "Describe in detail the documents listed in Incat's Trade Secrets Identification Statement (*see* Rec. Doc. 24-3) and what portions of the documents were contributed by others such as, for example, Birdon or the United States Coast Guard." Rec. Doc. 82-4, at 1. This Interrogatory, which cites Incat's original Trade Secrets

10

Identification Statement, was issued before Incat's Supplemental Disclosure, in which it made clear that Incat claims that the compilation of information in each Design Deliverable cited in its Supplemental Disclosure amounts to a trade secret, not that particular trade secrets are contained within the Design Deliverables. Incat contends that the entirety of each Design Deliverable is a trade secret and that any Coast Guard specifications or Birdon input that may have made its way into the Design Deliverables can be found by Birdon itself by reviewing the Design Deliverables and comparing them to any Coast Guard specifications and Birdon input that may be contained in Incat's 700,000 page document production.

Birdon also seeks a supplemental response to the portion of Interrogatory No. 9 that asks Incat to "[d]escribe in detail the nature of any 'skill, proprietary method[, or] approach,'" that Incat contends it used to create the Design Deliverables and a distinction between that "skill, proprietary method, or approach" and what was known in the industry at the time. Incat responded, in part, that its "proprietary methodologies and approaches differ significantly from general knowledge in the naval architecture field through their integration of specialized calculation techniques, design optimization processes, and performance prediction models that have been calibrated through Incat's extensive experience and proprietary datasets." Rec. Doc. 82-6, at 4. In addition to further narrative, Incat also cited about 900 pages of its document production as evidence of its proprietary processes.

At the Court's request, both parties made presentations at oral argument regarding the alleged trade secret Design Deliverables and the Coast Guard specifications, Birdon input, and industry standards reflected therein. Incat also presented some documents reflecting its proprietary processes, including flow charts depicting the steps in its processes, a spreadsheet with data points for over 700 vessels it has constructed historically, and internal case studies. It also displayed a

document of nearly 500 pages that laid out Coast Guard specifications in the form of instructions, including details related to toilets, signage, structural bulkheads, and training system requirements. During its presentation, Birdon added that the Coast Guard also provided specifications as drawings. Both sides showed examples of Birdon providing feedback and suggestions on Incat's designs by email to Incat.

 Birdon was able to identify several examples of the purported contributions by others (Coast Guard and Birdon) and the industry standards contained in Incat's trade secret documents. Birdon contends that although it was able to do so, it should not be tasked with this work. Instead, Birdon insists that because Incat bears the burden of proving the Design Deliverables qualify as trade secrets, Incat must first present evidence to show that each document is entitled to trade secret protection. Birdon seems to argue that the only way Incat can do so is by identifying its unique contributions to each document, identifying the contributions of others and the incorporation of industry standards for each document, and then explaining why the documents are trade secrets in spite of the inclusion of Coast Guard specifications, Birdon input, and industry standards.

 But at oral argument, Incat explained that it will show that the Design Deliverables qualify as trade secrets by citing the Coast Guard's conclusion that the Birdon-Incat proposal presented a superior design. It claims that the Coast Guard's selection of the more expensive Birdon-Incat proposal and the Coast Guard's recognition that the proposal reflected "forethought regarding the sustainment of the vessels" and had "the lightest structural weights of the designs being considered" shows that the designs Incat created are unique and could not have been (and were not) created by any other engineering firm that received the Coast Guard specifications for the project. Incat reported that it would also submit testimony that its unique methodologies allowed

12

it to achieve the characteristics that caused the Coast Guard to select the Birdon-Incat proposal over those of others. Incat also argued that provisions in the Teaming Agreement acknowledging the creation of intellectual property and the granting of a license by Incat to Birdon shows that the parties contemplated that Incat would create the intellectual property using its proprietary methods and that it was not simply a day laborer translating specifications into designs. Incat argues that its Design Deliverables are trade secrets in the same way a recipe is a trade secret – as a compilation of materials and information that may be publicly known but which are unique in their compilation.

The Court finds that further response by Incat to Interrogatories 8 and 9 is not proportional with the needs of this case. Incat claims that the Design Deliverables are the trade secrets. In ordering Incat to supplement its original Trade Secret Identification Statement, the undersigned already concluded that Incat would not be required to separate Incat's contributions from the contributions of the Coast Guard if it contended the entirety of each document to be the trade secret. See Rec. Doc. 55, at 7. And in ruling on Birdon's Motion to Dismiss, the District Court has considered Incat's Supplemental Disclosure and concluded that Incat had "identified the trade secrets in question with sufficient particularity to put [Birdon] on notice." Rec. Doc. 76, at 10. Incat has confirmed that any Coast Guard or Birdon contribution to the design deliverables would be included within the existing document production. Considering that Birdon itself provided the feedback that may have been included in the design deliverables and that the Coast Guard specifications are a defined universe of documents that both sides are capable of identifying, the Court finds that Birdon has all the relevant information and is in as good a position as Incat to make the connection between the contributions of others and Incat's Design Deliverables.

The same conclusion applies to the part of Interrogatory No. 9 that asks Incat to distinguish the portions of the Design Deliverables that incorporate industry knowledge. Birdon is familiar

with the industry standards that may have influenced or been included in Incat's designs. In fact, Birdon pointed out where Incat has cited trade group publications/standards. Again, Birdon has all the information it needs. Birdon can identify the inclusion of such standards in the trade secret documents just as easily as Incat.

Importantly the Court views Birdon's request that Incat identify the contributions of others and the inclusion of industry standards as an attempt to force Incat to prove the existence of its trade secrets in a way that suits Birdon. But Incat does not intend to prove each Design Deliverable is a trade secret by establishing that no Coast Guard or Birdon requirements were included and no industry standards were satisfied. Instead, Incat appears to contend that it took the Coast Guard and Birdon requirements, complied with industry standards, and using its proprietary methods, generated something unique and economically valuable that no other engineering firm participating in the proposal process came up with. It plans to prove this with testimony about its methods and with the Coast Guard's conclusions about the singular benefits of Incat's designs. Birdon's assertion that all or most of Incat's Design Deliverables amount to contributions of others and industry standards is Birdon's defense to mount. Incat has provided all information necessary for Birdon to do so. Birdon can make the connections that it believes will challenge Incat's claims; Incat will not be required to do so.

Critically, this case is not like RealD where the plaintiff attempted to identify its trade secrets as categories like "image recognition algorithms for different types of faces, lighting, eye color, and eyeglasses." 2023 WL 3304250, at *4. The RealD plaintiff was not allowed to simply describe the purportedly secret algorithm generically. Id. at *4-5. It was required to produce the algorithm. Id. at *5. The RealD plaintiff also claimed "data sets" were trade secrets but merely cited 3,000 pages. Id. at *6. The court required the plaintiff to specify the pages that revealed the

data sets. Id. In contrast, here, Incat has already specifically identified and produced each alleged trade secret.

As to the portion of Interrogatory No. 9 that asks Incat to describe how its proprietary processes resulted in the Design Deliverables, the Court finds that Incat's narrative response is sufficient at this stage. Whatever supplemental written response Incat may be able to draft is unlikely to satisfy Birdon's quest to show that there is, in fact, nothing special about Incat's processes or know how. Further information explicitly linking the proprietary processes to each trade secret document may be obtained via the deposition of Incat's corporate representative. The deposition can also be used to obtain any admissions Birdon seeks regarding whether the designs meet any "solely created" requirement and any connections Birdon wishes to explore between its feedback, Coast Guard specifications, and the Design Deliverables. The Court anticipates such deposition may require more time than provided by Federal Rule of Civil Procedure 30(d)(1). The parties should work together to conduct the deposition both efficiently and thoroughly, with additional time as appropriate. If they reach an impasse regarding the duration of the deposition, they may contact the undersigned for a status conference.

## Conclusion

The Court finds that Incat's responses to Interrogatory No. 8 and No. 9 are sufficient. Incat has identified the purported trade secrets with specificity and has explained the basis for its contention that the Design Deliverables qualify as trade secrets. Incat has produced all information necessary for Birdon to mount its defense. Requiring Incat to further make the connections Birdon believes will show Incat cannot meet its burden would be disproportionate with the needs of the case. As discussed above, the corporate deposition can be used to fill in any remaining blanks. Accordingly, the Motion to Compel is DENIED.

New Orleans, Louisiana, this 20th day of August, 2025.

                                               Janis van Meerveld
                                       United States Magistrate Judge